**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CARLOS ALBERTO CUENCA
FIGUEREDO,

    Petitioner,

v.                                            Case No. 3:22-cv-1268-TJC-LLL

YAURI DEL CARMEN ROJAS,

    Respondent.

## **O R D E R**

A little over two years ago, then five-year-old C.R.'s mother clandestinely took him from his home in Venezuela to start a new life in the United States where he remains. His father, who still lives in Venezuela, wants C.R. to come home. This case is the father's bid to repatriate his son.

The father, Petitioner Carlos Alberto Cuenca Figueredo, filed his Verified Petition Pursuant to the Hague Convention[1] on November 16, 2022. (Doc. 1 at 1). At Mr. Cuenca's request, the Court entered a temporary restraining order maintaining the status quo concerning C.R.'s residence which, after a hearing on December 1, 2022, the Court converted into a Consented Preliminary

---

[1] "The Hague Convention" or "Convention" refers to the Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq. (originally located at 42 U.S.C. § 11601).

Injunction. (Docs. 4, 5, 9). Respondent Yauri Del Carmen Rojas answered the Verified Petition and the parties filed briefs. (Docs. 13, 16–18). On February 14, 2023, the Court held a final evidentiary hearing at which both parties appeared and were represented by counsel, the record of which is incorporated by reference. (Doc. 29). Following the hearing, at the Court's request, Ms. Rojas filed a copy of her asylum application under seal. (Doc. 31).

I.     FINDINGS OF FACT

Mr. Cuenca and Ms. Rojas married on September 11, 2014, and divorced in May 2017. Their short-lived marriage had its share of conflict, leading to an argument on March 14, 2015, over finances and infidelity in which the spouses allegedly physically harmed each other. Mr. Cuenca and Ms. Rojas, pregnant with C.R. and nearing the end of the third trimester, separated.

C.R. was born in May 2015 and lived with Ms. Rojas. Mr. Cuenca did not have formal visitation rights until March 2016, almost a year after C.R. was born. Shortly after the Venezuelan courts granted Mr. Cuenca visitation rights, Ms. Rojas sought to take C.R., who was less than a year old, on vacation to the United States. Mr. Cuenca did not consent, and the Venezuelan courts agreed— citing dangerous travel conditions, the overbreadth of the travel permission request, and the risk that Ms. Rojas would not return. Ms. Rojas suspects that Mr. Cuenca's influential father encouraged the courts to ground her vacation plans, though no evidence of that was presented.

In May 2017, when C.R. was two years old, Mr. Cuenca and Ms. Rojas divorced. The divorce decree gave shared child-raising responsibility to both parents, formal visitation rights to Mr. Cuenca, and custody to Ms. Rojas. As C.R. grew older, his parents agreed to share their parenting responsibilities by having C.R. stay with his father during the daytime and with his mother at night. This arrangement continued for about four years, other than a several-month stretch in 2020 when Ms. Rojas was stuck by herself in the United States because of Covid-19 travel restrictions, during which C.R. stayed with Mr. Cuenca.

The status quo changed dramatically in March 2021. On March 16, 2021, Ms. Rojas crossed the land border between Venezuela and Colombia with C.R., boarded a plane, and flew to the United States. She told Mr. Cuenca's father that she was taking C.R. on vacation to a family property in Venezuela. But after three days of silence, on March 19, 2021, Ms. Rojas called Mr. Cuenca to tell him that she was in the United States with C.R. She said that they were only on vacation and would be returning home to Venezuela. She maintained this explanation throughout the summer of 2021, repeatedly telling him that she and C.R. would be coming back—even asking Mr. Cuenca to enroll C.R. in a Venezuelan school for the fall semester. But when the fall semester began and Ms. Rojas and C.R. remained abroad, Mr. Cuenca's fears were confirmed: Ms. Rojas was not bringing C.R. back to Venezuela.

Although the parties dispute how forthcoming Ms. Rojas was with her new address in the United States, in December 2021 Mr. Cuenca visited C.R. and Ms. Rojas in Orange Park, Florida. He tried to convince Ms. Rojas to come back to Venezuela with C.R., but she refused. After briefly consulting a couple of Florida attorneys, Mr. Cuenca returned to Venezuela to begin the legal process of repatriating C.R. In February 2022, he filed a criminal complaint against Ms. Rojas for removing C.R. from the country without authorization, filed an application with Venezuela's central Hague Convention authority for assistance, and received full custody of C.R. from the Venezuelan court overseeing his post-divorce proceedings. The criminal complaint remains under investigation, and the Venezuelan central authority helped connect Mr. Cuenca with the U.S. State Department, which helped him find an attorney.

Through counsel and participating remotely, Ms. Rojas appealed the Venezuelan court's custody decision. On June 6, 2022, the appellate court affirmed Mr. Cuenca's custody award. Ms. Rojas appealed to Venezuela's highest court, which, according to testimony at the evidentiary hearing, ruled in Mr. Cuenca's favor on February 3, 2023.

On November 16, 2022, while the final custody appeal was ongoing, Mr. Cuenca filed his Verified Petition in this Court. (Doc. 1). Filed nearly twenty months after Ms. Rojas and C.R. first came to the United States,

Mr. Cuenca asks the Court to order C.R.'s return to Venezuela. Ms. Rojas asks the Court to find C.R. well-settled and deny a return order.

## II. DISCUSSION

### A. The Prima Facie Case

Under the Hague Convention, to secure a return order a petitioner must make a prima facie showing that the child was wrongfully removed from his home country. Golan v. Saada, 142 S. Ct. 1880, 1889 (2022); see 22 U.S.C. § 9003(e)(1). A petitioner must prove by the preponderance of the evidence that: (1) the child was habitually resident of the country from which he was removed; (2) the child's removal from the home country violated the petitioner's custodial rights that the petitioner actually exercised at the time of the child's removal; and (3) the child is less than sixteen years old. Seaman v. Peterson, 766 F.3d 1252, 1257 (11th Cir. 2014) (citing Convention, arts. 1–5); Berenguela-Albarado v. Castanos, 950 F.3d 1352, 1358 (11th Cir. 2020) (citations omitted). If the petitioner proves each of these elements, a court must order the child's return, subject to any defenses raised by the respondent. Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008) (citations omitted); Convention, arts. 12–13.

At the February 14, 2023 evidentiary hearing, Ms. Rojas, through counsel, conceded that Mr. Cuenca had established the prima facie case on the pleadings, conceded that C.R. was wrongfully removed from Venezuela, and

5

confirmed that she intended to rely solely on her defenses. See (Doc. 29 at 11:5–13). Given Ms. Rojas' concessions and considering that the record shows that C.R. was habitually resident of Venezuela, that Mr. Cuenca actively exercised custody rights, and C.R. is under sixteen years old, Mr. Cuenca has established the prima facie case by the preponderance of the evidence. See (Doc. 17 at 2) (Ms. Rojas' answer conceding habitual residence); (Doc. 1 at 4–5) (Mr. Cuenca's Verified Petition testifying to his active exercise of custody rights); (Doc. 26-1 at 8) (C.R.'s redacted birth certificate).

### B.   Ms. Rojas' Defenses

After the petitioner makes a prima facie showing, the respondent may assert several defenses against a return order. Baran, 526 F.3d at 1344–45 (citations omitted). Any defenses must "be narrowly construed to effectuate the purposes of the Convention." Id. at 1345. If established, defenses enable, but do not require, a court to refuse a return order. Id.

Before the evidentiary hearing, Ms. Rojas initially asserted three defenses: (1) that returning C.R. would subject him to a grave risk of harm or an intolerable situation; (2) C.R. objects to being returned to Venezuela; and (3) C.R. is well-settled in the United States. (Doc. 17 at 5–6). At the evidentiary hearing, Ms. Rojas abandoned parts of her first and second defenses, as discussed below.

6

### 1.      Grave Risk of Harm or Intolerable Situation

Ms. Rojas' first defense is that returning C.R. to Venezuela would place him in harm's way. (Doc. 16 at 8–12). The Hague Convention allows a court to refuse a return order if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). The text of the Hague Convention does not further define these harms, but courts generally apply this defense in two scenarios: (1) when there is evidence of "serious abuse or neglect, or extraordinary emotional dependence," or (2) when the home country is "a zone of war, famine, or disease." Baran, 526 F.3d at 1347 (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996)). The respondent must prove this defense by clear and convincing evidence. Id. at 1345.

In her briefing and answer, Ms. Rojas initially argued both that C.R. might be abused by his father if he returned to Venezuela and that C.R. risked harm in Venezuela due to the ongoing humanitarian emergency. (Doc. 16 at 8–12); (Doc. 17 at 5). At the evidentiary hearing, Ms. Rojas, through counsel, conceded that there was no grave risk of Mr. Cuenca harming or abusing C.R. and confirmed that she intended to rely solely on her humanitarian emergency argument. (Doc. 29 at 81:14–83:17).

Ms. Rojas' main argument for why Venezuela is unsuitable for C.R.'s return is that that the country is facing economic and humanitarian upheavals.

7

See (Doc. 16 at 10–11). She testified that public officials are corrupt, crime is rampant, children have inconsistent access to education, and necessities like utilities, groceries, and healthcare are scarce. Id. She provides evidence that the United States Department of Homeland Security has designated Venezuela for Temporary Protected Status—granting eligible Venezuelan nationals temporary immigration status in the United States due to widespread humanitarian problems in Venezuela. (Doc. 26-21 at 3–4). Finally, she testified that she has a pending asylum application based on political persecution she allegedly suffered in Venezuela. (Doc. 29 at 104:21–105:9); see (Doc. 31).

For his part, Mr. Cuenca testified that he never heard Ms. Rojas complain of her safety while she lived in Venezuela and that C.R. was never endangered. (Doc. 29 at 21:25–22:12). Although he did not rebut Ms. Rojas' evidence of humanitarian problems in Venezuela generally, he explained that his neighborhood and the areas where C.R. would live and go to school were generally safe and had amenities comparable to those C.R. enjoys in the United States. Id. at 31:8–32:8 He supported his testimony with homemade videos showing his home, neighborhood, local grocery stores, parks, and the school C.R. would attend. (Doc. 26-12).

Ms. Rojas has not established sufficient humanitarian grounds to deny a return order under Article 13(b). Several courts have examined current-day conditions in Venezuela and found they do not raise sufficient humanitarian

8

concerns. In Rivero v. Godoy, the Southern District of Florida considered Venezuela's "deteriorating economy and rampant inflation," "country-wide shortage of food and medicine," and "violent protests," but still found they did not "rise to the level of 'zone of war, famine, or disease.'" No. 18-23087-CIV, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018). More recently, the Sixth Circuit found neither a grave risk of harm nor an intolerable situation—notwithstanding Venezuela's ongoing humanitarian crises—because the evidence showed that the affected children would still have access to schooling, food, medical care, and would be able to avoid areas of unrest. Salame v. Tescari, 29 F.4th 763, 768–70 (6th Cir. 2022).

The evidence similarly shows that C.R.'s basic needs will be met in Venezuela and he will be able to avoid dangerous situations. Mr. Cuenca and his parents—with whom C.R. would live—have access to the necessities, C.R. would attend school, and Mr. Cuenca complains of no crime, corruption, or unrest in his neighborhood. See (Doc. 29 at 31:8–32–8). Although Ms. Rojas allegedly suffered political persecution, she provided no evidence that C.R. would be targeted on her account if he returned and lived with his father. Given Mr. Cuenca's stable circumstances in Venezuela and his ability to provide C.R.'s necessities—even if these necessities are otherwise scarce in Venezuela—returning C.R. to Venezuela would not subject him to a grave risk of harm or an intolerable situation.

### 2. C.R.'s Wishes

A court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] view." Convention, art. 13. The respondent must show this by the preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). Ms. Rojas initially invoked this defense in her answer and briefing, indicating that C.R. wished to remain in the United States and asking the Court to conduct an in camera examination of C.R. (Doc. 16 at 12–13); (Doc. 17 at 5–6). However, at the evidentiary hearing, Ms. Rojas, through counsel, stated that she was no longer advocating for an in camera examination and that she was leaving the matter solely to the Court's discretion. (Doc. 29 at 117:21–118:3).

The Hague Convention does not provide a specific age or "objective criteria or tests for assessing 'maturity,'" leaving courts to make a fact-intensive case-by-case determination. Colon v. Mejia Montufar, 470 F. Supp. 3d. 1280, 1295–96 (S.D. Fla. 2020) (quoting Haimdas v. Haimdas, 720 F. Supp. 2d 183, 205 (E.D.N.Y. 2010)). C.R. is only seven years old, and Ms. Rojas points to no facts in the record demonstrating C.R.'s maturity or reasons for wanting to stay in the United States. Ms. Rojas also abandoned her request that the Court interview C.R. Thus, there is insufficient evidence to support Ms. Rojas' mature child defense. See Lopez v. Alcala, 547 F. Supp. 2d 1255, 1259 (M.D. Fla. 2008)

("[The child] is only 7 years old and therefore, this Court finds that she has not reached this age and degree of maturity.") (Presnell, J.).[2]

### 3. Whether C.R. is Settled

The final defense Ms. Rojas raises is that C.R. is settled in the United States. If a petitioner files a Hague Convention petition more than one year after "the date of the wrongful removal or retention," a respondent can assert as a defense "that the child is now settled in [his] new environment." Convention, art. 12. The defense is inapplicable if the petition is filed within one year of the wrongful removal or retention, and a respondent must prove this defense by the preponderance of the evidence. See id.; Seaman, 766 F.3d at 1257 (citation omitted).

Ms. Rojas wrongfully removed C.R. on March 16, 2021, and informed Mr. Cuenca of the removal on March 19, 2021, but Mr. Cuenca did not file his Verified Petition until November 16, 2022—almost twenty months later. Although Mr. Cuenca identifies steps he took to locate and return C.R. during this twenty-month period and argues that Ms. Rojas concealed her address in Florida, the one-year deadline cannot be equitably tolled to remedy concealment. Lozano v. Montoya Alvarez, 572 U.S. 1, 15–16 (2014). In any event, Mr. Cuenca visited C.R. in the United States in December 2021, well

---

[2] The Court does not rule out that in a different case, a seven-year-old child might be permitted to express his or her wishes.

11

within the one-year mark. The evidence shows C.R. has not changed residences since then. (Doc. 29 at 84:24–85:7).

Turning to the defense itself, the Hague Convention does not define "settled" or provide any analytical guidance. However, courts generally consider the following factors:

> (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the mother's employment; and (6) whether the child has friends and relatives in the new area.

Lopez, 547 F. Supp. 2d at 1259 (collecting cases) (quoting In re Koc, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)). Courts additionally consider the respondent and child's immigration status and whether the respondent concealed the child. Id. at 1259–60 (citations omitted).

Analyzing these factors, the Court finds that C.R. is settled. C.R., now almost eight years old, has lived at the same address and attended the same school since he came to the United States. (Doc. 29 at 85:1–6); see (Docs. 26-13–26-14). C.R. has generally flourished in school, as shown by his report cards and many awards. (Doc. 26-13); (Doc. 26-14); (Doc. 26-16). His teacher testified that C.R. is well-liked, a good student, and has learned English quickly. (Doc. 29 at 69:25–71:12); see (Doc. 26-15). His after-school instructor testified that C.R. has made close friends in and out of school and has developed a weekly routine.

(Doc. 29 at 60:19–62:17). C.R. enjoys extra-curricular activities such as swimming and martial arts. Id. at 64:11–21; see (Doc. 26-17). Finally, Ms. Rojas testified that she has legal work authorization, she is an "on-the-books" employee, and she owns a car. (Doc. 29 at 86:20–87:11, 94:24–95:1, 104:12–18).

These factors all indicate that C.R. is settled—but the Court must also consider Ms. Rojas and C.R.'s immigration circumstances. Ms. Rojas does not have a permanent form of legal status in the United States, which can affect C.R.'s stability. Lopez, 527 F. Supp. 2d at 1260. But Ms. Rojas and C.R. are not "subject to deportation at anytime," id., because Ms. Rojas has taken steps to acquire legal status in the United States. See (Doc. 31). As she testified during the evidentiary hearing, Ms. Rojas has a pending asylum application. Id.; see (Doc. 26-19 at 2) (notice of action indicating that Ms. Rojas may "remain in the U.S. until [her] asylum application is decided"). The Court expresses no judgment as to the ultimate merits of her asylum claim, but her application is detailed and non-frivolous. Her attorneys also explained that her first master calendar hearing—a hearing to resolve scheduling issues—is scheduled for February 2024. (Doc. 29 at 115:6–10). At that hearing, the government may either schedule a final hearing on Ms. Rojas' application or it may continue the matter and schedule another master calendar hearing. See id. at 115:25–116:7. Either way, even if Ms. Rojas' application is ultimately unsuccessful, there is no immediate threat of removal. Further, eligible Venezuelan citizens enjoy

13

Temporary Protected Status—which includes protection from removal—until at least March 2024. (Doc. 26-21 at 2–6); Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024 (Sept. 8, 2022).[3] So even if Ms. Rojas and C.R. do not currently have permanent legal status, any possible removal is likely years away and may never happen.

On balance, even considering that Ms. Rojas and C.R.'s immigration status is not finally resolved, Ms. Rojas has shown by a preponderance of the evidence that C.R. is settled in the United States within the meaning of the Hague Convention.

### C.     C.R. Should Not Be Returned

Having determined that C.R. is settled in the United States, the Court may, but is not required to, deny Mr. Cuenca's requested return order. See Baran, 526 F.3d at 1345. "[A] federal court retains the discretion to return a child despite the existence of a valid defense if returning the child would further the aims of the Convention." Cabrera v. Lozano, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (citing Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001)). All the same, the Hague Convention's purpose of "discouraging child abduction" should not be pursued "at any cost." Lozano, 572 U.S. at 16.

---

[3] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice that the Secretary of Homeland Security has extended Venezuela's Temporary Protected Status through March 10, 2024.

"[C]hildren should not be made to suffer for the sake of general deterrence of the evil of child abduction world wide." Id. at 16–17 (quoting In re M, [2008] 1 AC 1288, 1310 (Eng. 2007)).

As Ms. Rojas herself admits, she wrongfully took C.R. from his home in Venezuela. Even crediting her asylum application, which explains why she might have feared remaining in Venezuela, she could have worked with Mr. Cuenca to find a mutually agreeable solution. She has also ignored the final custody ruling of the Venezuelan courts, even after participating in the proceedings. And Ms. Rojas is resolute that she will not return to Venezuela out of concern for her safety.

But this case is not just about Mr. Cuenca or Ms. Rojas. C.R. is in this equation too, and he has a happy life, close friends, and settled routine in the United States. Mr. Cuenca has shown that he can readily come to the United States to visit, and he and C.R. talk via FaceTime almost daily. The Court is loath to further disrupt C.R.'s life. Although this is a close case, the Court will not order his return to Venezuela.

In the absence of a return order, the Court strongly encourages Ms. Rojas and Mr. Cuenca to work out liberal and fulsome visitation and other ways to keep Mr. Cuenca a significant part of C.R.'s life. Both parents should be guided by what is best for C.R. Failing that, Mr. Cuenca can likely

15

seek a formal custody arrangement from the Florida Circuit Court of jurisdiction. Cf. Convention, arts. 16, 19.

Accordingly, it is hereby

**ORDERED:**

1) Petitioner's Verified Petition Pursuant to the Hague Convention (Doc. 1) is **DENIED**.

2) The Consented Preliminary Injunction (Doc. 9), entered on December 1, 2022, is **VACATED**.

3) The Clerk shall release Ms. Rojas and C.R.'s passports and travel documents to Ms. Rojas. Ms. Rojas or her attorney shall contact the Clerk's Office to arrange to retrieve this documentation.

4) The Clerk should close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 18th day of April, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

rmv
Copies:

Counsel of record