# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 01, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 23-12566-Q
Case Style: Carlos Alberto Cuenca Figueredo v. Yauri Carmen Rojas
District Court Docket No: 3:22-cv-01268-TJC-LLL

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing must include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th Cir. R. 35-5(k) and 40-1.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion

[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-12566

_____

CARLOS ALBERTO CUENCA FIGUEREDO,

                                                                        Petitioner-Appellant,

*versus*

YAURI DEL CARMEN ROJAS,

                                                                         Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-01268-TJC-LLL

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 4 of 19 PageID 1022
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 2 of 17

2                    Opinion of the Court                    23-12566

GRANT, Circuit Judge:

Eight-year-old C.R. and his parents are all citizens of Venezuela, where C.R. was born and where his father, Carlos Cuenca Figueredo (Cuenca), still lives. C.R.'s mother, Yauri Rojas, took C.R. from Venezuela three years ago without his father's knowledge or permission and brought him to the United States. She and C.R. have lived in the same apartment near Jacksonville, Florida ever since.

Twenty months after Rojas absconded with their only child, Cuenca filed a petition in the Middle District of Florida seeking the return of his son under the Hague Convention on the Civil Aspects of International Child Abduction. The Convention and its implementing legislation generally require the immediate return of a child to his home country when the abandoned parent files a petition for return within one year of the wrongful removal of the child. But because Cuenca filed his petition more than a year after C.R.'s mother took him from Venezuela, the Convention allowed the district court to refuse his petition for return if it found that C.R. was settled in his new home in the United States.

The district court did find that C.R. was settled in his new environment—after two years living in the same home, attending the same elementary school, and participating in various extracurricular activities in the same community in Florida—and it denied Cuenca's petition for C.R.'s return. To resolve Cuenca's appeal, we must decide whether and how the immigration status of a child and respondent affects child-settlement decisions under

Case 3:22-cv-01268-TJC-LLL    Document 43    Filed 05/01/24    Page 5 of 19 PageID 1023
USCA11 Case: 23-12566    Document: 52-1    Date Filed: 05/01/2024    Page: 3 of 17

23-12566                Opinion of the Court                3

the Convention. Along the way, we must also clarify our standard of review for the district court's determination that a child is or is not "settled" within the meaning of the Convention.

We conclude that immigration status is one factor among many that may be relevant when assessing the relative stability and permanence of the child's connections to his new home. As with any other relevant factor, the weight assigned to immigration status will vary according to the child's individual circumstances. And because identifying and weighing all the relevant factors to determine whether a child is settled in his new home is essentially a factfinding exercise, we review the district court's determination on this issue only for clear error.

The district court here correctly identified C.R. and his mother's immigration status as a relevant—but not dispositive—factor in whether C.R. is settled in his home in Florida. The court's finding that C.R. is settled in his new environment was not clearly erroneous, and its decision not to order C.R.'s return to Venezuela despite his settlement was not an abuse of discretion. We therefore affirm the denial of Cuenca's petition.

I.

A.

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *see generally* Convention, Oct. 25, 1980, T.I.A.S. No. 11,670, S. Treaty Doc. No. 99–11. The

Case 3:22-cv-01268-TJC-LLL    Document 43    Filed 05/01/24    Page 6 of 19 PageID 1024
USCA11 Case: 23-12566    Document: 52-1    Date Filed: 05/01/2024    Page: 4 of 17

4                          Opinion of the Court                    23-12566

Convention's "core premise" is that children's interests in custody matters "are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Convention, pmbl.). In service to that principle, the Convention requires signatory nations to establish procedures for the rapid return of abducted children to the place where the child habitually resided before the abduction. Convention, pmbl., arts. 1–2, 6–12.

The United States ratified the Convention, and Congress implemented it through the International Child Abduction Remedies Act (ICARA). *See* T.I.A.S. No. 11,670; 22 U.S.C. § 9001 *et seq*. ICARA allows the parent of an abducted child to file a petition for the child's return in a state or federal court in the jurisdiction where the child is located, and directs courts to "decide the case in accordance with the Convention." 22 U.S.C. § 9003 (a)–(b), (d). Consistent with the objects of the Convention, ICARA provides that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." *Id*. § 9001(a)(4).

One of the Convention's "narrow exceptions" applies only when the parent seeking the child's return files her petition more than one year after the child's wrongful removal or retention. *See* Convention, art. 12. In that case, the court is not required to order the return of the child if the responding parent shows by a preponderance of the evidence that "the child is now settled in its

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 7 of 19 PageID 1025
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 5 of 17

23-12566               Opinion of the Court                5

new environment." *Id.*; *see* 22 U.S.C. § 9003(e)(2)(B). Even then, the court has the discretion to order the child's return—though "the return of a settled child should be an infrequent occurrence." *Fernandez v. Bailey*, 909 F.3d 353, 363 (11th Cir. 2018); *see* Convention, art. 18.

**B.**

The parties here do not dispute that Rojas wrongfully removed C.R. from Venezuela in March 2021 in violation of their custody agreement and Cuenca's parental rights under Venezuelan law. At the time, Cuenca and Rojas—who separated before C.R. was born and divorced two years later—shared custody of C.R. so that he spent his days with Cuenca at his paternal grandparents' home and his nights with Rojas. One morning, Rojas told the paternal grandfather that she was taking C.R. to a family farm in Venezuela; she took him across the border into Colombia and then to the United States. She called Cuenca a few days later and told him that she and C.R. were on vacation in the United States. She revealed that they were in Jacksonville, Florida, but did not provide a specific address.

During the months that followed, Rojas repeatedly assured Cuenca that she would return to Venezuela with their son in time for him to start school there in the fall. But even while she attempted to placate Cuenca, she enrolled C.R. in the local elementary school after moving in with her boyfriend in Orange Park, Florida (a suburb of Jacksonville). She also applied for asylum in the United States for both herself and C.R. She was given a

Social Security number, authorization for employment, and permission to remain in the United States for the duration of the asylum proceedings. She bought a car, got a full-time job, and enrolled C.R. in a YMCA program before and after school. In October 2021, she admitted to Cuenca that she intended to settle permanently in the United States with C.R.

Two months later, Cuenca visited his son in Florida and attempted to persuade Rojas to send C.R. back to Venezuela. She refused. He returned to Venezuela and filed an action for custody of C.R. Rojas appeared in the Venezuelan custody proceedings through counsel, but ultimately the Venezuelan courts awarded full custody of C.R. to Cuenca and denied Rojas's appeal.

In the meantime, C.R. flourished in his new home. He and Rojas continued to live in the same apartment in Orange Park, Florida and took trips to visit a cousin in Orlando and family friends in South Carolina. He learned to speak and read English, earned good grades, and made friends in the neighborhood, at the YMCA, and at school. He took swimming lessons and karate classes. He won school awards for academics, good character, helpfulness, citizenship, and perfect attendance. At the YMCA, he won the "most friendly" award for making the most friends throughout the year.

C.R. also maintained ties with his family in Venezuela. He spoke with his father, his paternal grandparents, and his uncle on the phone almost every day, and his father traveled to the United States to visit him three times between December 2021 and

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 9 of 19 PageID 1027
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 7 of 17

23-12566                Opinion of the Court                          7

February 2023. According to Cuenca, C.R. initially said that he would like to return to Venezuela, but he didn't want to leave his mother. But after nearly two years in the United States, according to Rojas's uncontradicted testimony, C.R. preferred his life and his friends in the United States and said openly that he did not want to go back to Venezuela.

## C.

Twenty months after Rojas left Venezuela with C.R., Cuenca filed a petition in the Middle District of Florida seeking his son's return under the Convention and ICARA. Rojas opposed the petition, arguing that even if it was wrong of her to take C.R. out of Venezuela, one or more of the Convention's exceptions to the return remedy applied. In particular, Rojas argued that C.R. should not be returned to Venezuela because Cuenca had filed his petition more than a year after she removed C.R. from Venezuela and he had since become settled in his new home in the United States.[1]

The district court held an evidentiary hearing and heard testimony from Cuenca, Rojas, one of C.R.'s teachers, and an employee of the YMCA where C.R. attended before- and after-school programs. After the hearing, the district court instructed Rojas to file her asylum application under seal, which she did.

---

[1] Initially, Rojas also argued that C.R.'s return to Venezuela would expose him to physical or psychological harm, and that C.R. wished to remain in the United States and was old enough and mature enough that his wishes should be considered. *See* Convention, art. 13. She has since abandoned those arguments.

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 10 of 19 PageID 1028
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 8 of 17

8                    Opinion of the Court                    23-12566

Based on all the evidence before it, the district court determined that Cuenca had established a prima facie case for C.R.'s return under the Convention by showing that the child was less than 16 years old and that Rojas had wrongfully removed him from Venezuela, his place of habitual residence. But the court also concluded that the Convention did not require C.R.'s return because Cuenca had filed his petition more than a year after the child's wrongful removal from Venezuela, and C.R. had become settled in his new environment.

In making its finding that C.R. was settled in Florida, the district court considered his uncertain immigration status as one factor, but noted—without making any judgment on the merits of Rojas's immigration case—that the application for asylum was detailed and not frivolous, and that Rojas had been granted authorization to remain and work in the United States while the petition remained pending. The court also noted that eligible Venezuelan citizens enjoyed Temporary Protected Status due to poor humanitarian conditions in that country. This meant that Rojas and C.R. probably would not be removed from the United States for at least another year even if Rojas's application for asylum were eventually denied.

Finally, the district court acknowledged that it had the discretion to return C.R. to Venezuela under the Convention even though he was settled in the United States. *See* Convention, art. 18; *Fernandez*, 909 F.3d at 362. But the court declined to exercise that discretion, concluding that C.R.'s interest in settlement

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 11 of 19 PageID 1029
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 9 of 17

23-12566                Opinion of the Court                9

outweighed his father's interest in C.R.'s return and the general need to discourage wrongful conduct like his mother's.

On appeal, Cuenca argues that the district court failed to adequately consider Rojas and C.R.'s immigration status in determining that C.R. was settled in the United States. And he argues that even if C.R. is settled, other equitable considerations outweigh the interest in settlement and should have led the district court to order C.R. returned to Venezuela.

## II.

Before reaching the merits of Cuenca's appeal, we must clarify the standard of review for a district court's determination that a child is or is not "settled" in his new home within the meaning of the Convention—a question we have not explicitly answered in previous cases. Generally, in deciding an appeal under the Convention and ICARA, we review a district court's legal conclusions de novo and its factual findings for clear error. *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016). The determination of whether a child is settled in his new environment presents, at least to some extent, a mixed question of law and fact. The standard of review for such questions depends on "whether answering it entails primarily legal or factual work." *Monasky*, 589 U.S. at 83–84 (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)).

Like the analogous concept of a child's "habitual residence," the determination of whether a child is settled begins with the selection of the appropriate legal framework: a case-specific

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 12 of 19 PageID 1030
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 10 of 17

10                    Opinion of the Court                    23-12566

totality-of-the-circumstances analysis. *Fernandez*, 909 F.3d at 361; *see Monasky*, 589 U.S. at 84. "Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard" is classic factfinding work. *Monasky*, 589 U.S. at 84; *see Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998) (describing the district court's determination on the issue of settlement as a finding of fact). The court must "marshal and weigh evidence, make credibility judgments," and consider "multifarious, fleeting, special, narrow facts" specific to the child's circumstances. *Vill. at Lakeridge*, 583 U.S. at 396 (quotation omitted). The assessment of whether a child is settled "thus presents a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court." *Monasky*, 589 U.S. at 84. "A factual finding is clearly erroneous when a review of the entire record leaves us with the definite and firm conviction that a mistake has been committed." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357 (11th Cir. 2020) (quotation omitted). But even if the district court finds, as it did here, that the wrongfully removed child is "now settled in its new environment," the court has the discretion to order the child returned to the country where he or she habitually resided at the time of the removal. Convention, art. 12; *Fernandez*, 909 F.3d at 362–63. We then review the district court's ultimate decision whether to return a child for abuse of discretion. *Fernandez*, 909 F.3d at 363.

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 13 of 19 PageID 1031
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 11 of 17

23-12566               Opinion of the Court                11

### III.

#### A.

Neither the Convention nor ICARA defines the term "settled" or provides any guidance on the factors courts should consider when determining whether a child is settled. In this circuit, a child is "settled" for purposes of the Convention "when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment." *Id.* at 361. In making this determination, courts must "carefully consider the totality of the circumstances," including evidence of the child's "significant connections to the new country" as well as evidence of continuing "contacts with and ties to his or her State of habitual residence." *Id.* (quoting State Dep't Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (March 26, 1986)).

Factors that may be relevant to whether a child is "settled" in his new environment include (1) whether the child is old enough to form attachments beyond the parent or guardian with whom he lives; (2) the duration and stability of the child's residence in the new country; (3) whether the child has friends and relatives in the new environment; (4) whether the child regularly attends school or daycare; (5) the child's participation in community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the child and respondent's immigration status. *See da Costa v. de Lima*, 94 F.4th 174, 179–80 (1st Cir. 2024);

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 14 of 19 PageID 1032
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 12 of 17

12                          Opinion of the Court                     23-12566

*Hernandez v. Garcia Peña*, 820 F.3d 782, 787–88 (5th Cir. 2016); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 17 (2014).

Here, Cuenca does not contest the district court's determination that most of the relevant circumstances weigh in favor of finding that C.R. is settled in his new environment. C.R. is now almost nine years old, and he has been living in the same apartment in Florida with his mother and her boyfriend since he arrived in the United States three years ago. He has made many friends and has developed close friendships with children his age who attend classes and after-school programs with him. He has attended the same elementary school since 2021. He has become fluent in English, is doing well in all his classes, and is well-liked by his teachers and other students. He loves participating in activities at the YMCA and is considered the leader of his group of friends there. He also enjoys the karate lessons he began taking last year. His mother has stable, full-time, "on-the-books" employment, is financially capable, and plans to remain permanently in the United States. In short, C.R. has acclimated well to his new home and has developed significant, enduring connections to his community.

Despite these signs that C.R. has become established in his new life, Cuenca argues that his son's lack of permanent legal status in this country means that he cannot be considered "settled" as that term is used in the Convention. More specifically, he argues that discrepancies between Rojas's testimony at the evidentiary hearing and her application for asylum showed that the application was fraudulent and has no chance of success. He also argues that the

district court should not have considered the Secretary of Homeland Security's extension of Temporary Protected Status for Venezuelans because Rojas and C.R. were not eligible for that protection at the time.

We agree that a child's lack of permanent legal status in the United States can have a negative impact on his ability to establish a "stable, permanent, and nontransitory life" in this country, especially if removal seems imminent. *Fernandez*, 909 F.3d at 361. But we decline to state categorically that a child without permanent legal immigration status cannot become "settled" in the United States within the meaning of the Convention. Instead, we join several of our sister circuits in holding that a child's immigration status is one relevant factor that must be evaluated in the context of the child's individual circumstances. *See da Costa*, 94 F.4th at 180; *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012); *Alcala v. Hernandez*, 826 F.3d 161, 171 (4th Cir. 2016); *Hernandez*, 820 F.3d at 787–88; *In re B. Del C.S.B.*, 559 F.3d 999, 1009–14 (9th Cir. 2009). Whether the child and respondent are present illegally, whether they have a feasible path to permanent legal residence, and whether they are currently embroiled in removal proceedings will all be relevant to the court's ultimate finding on the issue of settlement.

When the respondent and child have a pending application for permanent legal status, an assessment of the facial validity of the application may be helpful. But we reject the suggestion that district courts should attempt to prejudge the merits of an

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 16 of 19 PageID 1034
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 14 of 17

14                    Opinion of the Court                    23-12566

immigration petition—in general, district courts have no role in immigration proceedings and are not in the best position to predict how an immigration judge or the Board of Immigration Appeals may rule. *See* 8 U.S.C. § 1252(a)(5).

Here, the district court appropriately considered that Rojas's application for asylum was "detailed and non-frivolous" while declining to express an opinion on the merits of the application. It is true that Rojas's testimony at the evidentiary hearing contradicted one of the statements in her application for asylum. But the essential parts of Rojas's asylum claim—her history of serious conflicts with Venezuelan authorities and her fear of returning there—were consistent with her testimony in the district court. And because Cuenca failed to raise this issue until after the district court denied his petition and the record contained nothing from Rojas's asylum proceedings except the initial application, the district court had no way of knowing whether Rojas would be able to correct her application or explain the inconsistency to the immigration judge.

Considered in context with other details of C.R.'s immigration status, the uncertain fate of Rojas's application for asylum does not necessarily outweigh the evidence of C.R.'s many lasting connections to his new community. As the district court noted, Rojas and C.R. were authorized to remain in the United States for the duration of the proceedings on their asylum claim. They had been living in Florida for two years already, and they had not yet had the first scheduling hearing in their immigration

23-12566           Opinion of the Court            15

proceedings. And although Rojas and C.R. did not then meet the length-of-residency requirement for Temporary Protected Status, the Secretary's formal declaration in September 2022 that "severe economic and political crises ongoing within Venezuela" prevented Venezuelans from returning in safety at least indicated that their removal to Venezuela would not be a priority in the near future.[2] Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55,024, 55,026 (Sept. 8, 2022). In the circumstances, we cannot say that the district court clearly erred in finding that C.R. is "now settled" in his new environment.

## B.

Of course, the fact that C.R. is settled does not end the matter; the Convention gives courts the discretion to order the return of even a settled child. *See* Convention, art. 18. But that discretion should be exercised sparingly to avoid "swallow[ing] the text of Article 12's stated exception" allowing settled children to stay where they are. *Fernandez*, 909 F.3d at 363. Sometimes, though, the objectives of the Convention—ensuring that child-custody decisions are made in the child's home country and discouraging parents from absconding with children in search of a friendlier custody forum—will outweigh the child's interest in

---

[2] In October 2023, Secretary Mayorkas re-designated Venezuela for Temporary Protected Status, offering Rojas and C.R. protection from removal through at least April 2025. Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68,130 (Oct. 3, 2023), *corrected by* 88 Fed. Reg. 80,327 (Nov. 17, 2023).

Case 3:22-cv-01268-TJC-LLL   Document 43   Filed 05/01/24   Page 18 of 19 PageID 1036
USCA11 Case: 23-12566   Document: 52-1   Date Filed: 05/01/2024   Page: 16 of 17

16                    Opinion of the Court                    23-12566

settlement. *See id.* at 363–64. Factors that may be relevant in this inquiry include the child's remaining ties to his home country, his "need for contact with the non-abducting parent," "the non-abducting parent's interest in exercising the custody to which he or she is legally entitled," and "the need to discourage inequitable conduct" by abducting parents. *Lozano*, 572 U.S. at 20 (Alito, J., concurring).

Still, returning a settled child is the exception rather than the rule, and here the district court did not abuse its discretion in declining to order C.R.'s return to Venezuela. Rojas's conduct in removing C.R. from his home in violation of his father's custody rights was undoubtedly wrongful, as was her initial dishonesty in informing Cuenca that she planned to return with C.R. even as she applied for asylum. But she informed Cuenca almost immediately that she had taken C.R. to Jacksonville, and she has made no effort to conceal his location or keep Cuenca from speaking to C.R. or visiting him in Florida. And although the district court's denial of Cuenca's petition means that he will have to sue in Florida if he wishes to formalize a custody arrangement, the district court's decision does not prevent the Florida court from awarding Cuenca whatever custody and visitation rights it deems suitable.

★   ★   ★

Carlos Cuenca Figueredo established that his ex-wife wrongfully abducted their only child from his home in Venezuela in violation of Cuenca's custody rights. Ordinarily, the Hague Convention on the Civil Aspects of International Child Abduction

would mandate the "prompt return" of Cuenca's son. But Cuenca waited more than a year to file his petition for the child's return under the Convention, and in the meantime, his son developed stable, enduring ties to his new community. Under the circumstances, the district court did not clearly err in finding that Cuenca's son was "settled" in his new home in the United States. And because the facts of this case did not present equitable considerations outweighing the child's interest in settlement, the district court did not abuse its discretion in refusing to order his return to Venezuela. We therefore affirm the denial of Cuenca's petition.

**AFFIRMED.**